LITTLE et al. v. ST. LOUIS UNION TRUST COMPANY et al.; NATIONAL BANK OF COMMERCE OF ST. LOUIS, Appellant.

Division One, June 19, 1906.

1. **INTERPLEADER: Equity: Right to Maintain Bill.** To entitle one to maintain a bill of interpleader in equity, he must be a mere disinterested stakeholder or trustee; he must act in good faith, and must have a real doubt as to which of the claimants of the fund is entitled to it.

2. ——: ——: ——: **Informing Claimants: Collusion.** Where a question is once raised as to which of certain claimants is entitled to a fund, if the trustee deems the question a serious one, if the facts are sufficient to cause the trustee to seriously question whether he is in duty-bound to pay the money to the one claimant or to the other, there is nothing wrong

in his informing either claimant that such a question has arisen; and even though one of them had known nothing of the fund or his right thereto, if he was in law entitled to it, good faith required the trustee to inform him of the facts, and such action does not indicate collusion between the trustee and the person so informed, even if such person afterwards sues the trustee for the fund, and the trustee pays the fund into court, and asks that the rival claimants be compelled to interplead for it.

3. ———: Corporation: Treasury Stock: Certificate to Treasurer: Assignment: Notice: Rightful Owner. A certificate or receipt of a trust company issued to the treasurer of a corporation, for certain unissued certificates of treasury stock of the corporation, which, with all other stock of its stockholders, have been deposited with the trust company in trust in pursuance of the sale of the corporation's assets to a purchaser and for the purpose of conveying title to the purchaser and distributing the money paid pro-rata among the stockholders, is not a negotiable instrument in the sense of the law merchant, and, therefore, the trust company is not estopped from questioning the assignment thereof by the treasurer to a third party. Besides, when the certificate recites on its face that it is issued to the "treasurer . . . under and pursuant to the terms" of the trust agreement made by the trust company with the corporation, the assignee taking it is chargeable with notice of the contents of that agreement, and if the agreement means that the entire sum paid is to be divided pro-rata among the bona-fide holders of the stock that had been actually issued, to the exclusion of the holder of the treasury stock which was never issued, then the assignee is bound by the terms of that agreement and has no right to the fund.

4. ———: ———: ———: Release by Directors. A resolution of directors, reciting that a payment of a certain sum of money on each share of stock by a trustee employed to transfer the properties of the corporation to a purchaser, would be "a final liquidation of the assets" of said corporation, cannot limit the stockholders' demands, even if complied with.

5. ———: ———: ———: Receipt. A receipt by stockholders from the trustee authorized to transfer the corporation's properties and receive payment therefor, in which they acknowledge payment in full and transfer their stock, does not preclude them from demanding more if more is due them.

6. ———: ———: ———: Majority of Stockholders. Every stockholder is free to act for himself in demanding of a trustee money received by the trustee for the assets of the corporation. The minority are not bound to concede that a certain fund re-

ceived for unissued treasury stock belongs to a claimant simply because a majority do so. Besides, the relation of the majority to the other claimant is a proper subject of inquiry in determining the right of the minority to interplead for the funds.

7. ———: Doubt: Question of Law or Fact. Where there is sufficient substantial doubt or hazard of payment to justify interpleader at all, the bill will be entertained, whether the conflicting claims depend on questions of fact or questions of law.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Blevins,* Judge.

AFFIRMED.

*Albert N. Edwards* and *Geo. L. Edwards* for appellant.

(1) "It is very well settled that an interpleading suit involves two successive litigations; one between the plaintiff in the bill and the defendants, upon the question whether or not the defendants shall interplead; the other between the different defendants, i. e., the interpleading itself. The subjects of these two litigations are wholly separate and distinct, and, therefore, require separate and distinct allegations and proofs. In such a case the only decree that a plaintiff can have is that the defendants do interplead. When this is obtained, the plaintiff is altogether out of the suit, leaving the interpleading defendants alone to contest their conflicting claims." Duke, Lennon & Co. v. Duke & Wood, 93 Mo. App. 250; Roselle v. Bank, 119 Mo. 92. (2) The equitable remedy of interpleader depends upon and requires the existence of the four following elements, to-wit: "1. The same thing, debt or duty must be claimed by both or all of the parties against whom the relief is demanded; 2. All their adverse titles or claims must be dependent, or be derived from a common source; 3. The person asking the relief —the plaintiff—must not have nor claim any interest

in the subject-matter; 4. He (the plaintiff) must have incurred no independent liability to either of the claimants; that is, he must stand perfectly indifferent between them, in the position merely of a stakeholder." 4 Pomeroy's Eq. Jur. (3 Ed.), sec. 1322. (3) The applicant for interpleader "must not have lent himself in any way to further the claim of either party to the funds in controversy. Marvin v. Ellwood, 11 Paige '374. The whole theory upon which an interpleader is allowed is that the claims against the plaintiff have been made against him without his procurement (Belcher v. Smith, 9 Bing. 82) and without collusion with either claimant." Swain v. Bartlett, 82 Mo. App. 642. (4) "In order to justify the sustentation as such, a bill of interpleader should show that there is some doubt in point of fact to which of the rival claimants the admitted debt or duty belongs. It should show also a color of right derived from a common source in the respective claimants, but it should not show a clear title in either against the other. It should satisfy the court that the debtor is a mere stakeholder and entitled before payment to the protection of equity in enforcing a settlement of the opposing claims." Beach's Modern Equity Practice, sec. 148; Supervisors v. Alford, 65 Miss. 63; Sullivan v. Knights of Father Matthew, 73 Mo. App. 45; Funk v. Avery, 84 Mo. App. 494; Atkinson v. Carter, 101 Mo. App. 484. (5) "A stakeholder cannot have an interpleader when it appears that a payment of delivery to one of the claimants would have discharged him from all liability." Maclennan on Interpleader, p. 136; Delaney v. Murphy, 24 Hun 503. (6) Because of the certificate issued by the Trust Company to W. P. Heath, and upon the faith of which the bank bought the same and invested its money, the Trust Company is now estopped to set up or claim that said stock so certified to have been deposited with it by said Heath is "dead" stock, or not lawful stock of said corporation, and that the

"legal holder" of said certificate is not entitled to receive the money which it therein certifies he is entitled to receive.   1 Greenleaf on Ev. (15 Ed.), sec. 22; 11 Am. and Eng. Ency. Law (2 Ed.), 400; Bigelow on Estoppel (5 Ed.), pp. 459 and 460; Ewart on Estoppel (1900), p. 340.   (7)   "A fact agreed or assumed to be true as the basis of a contract must be taken to be true specifically until the contract itself is lawfully impeached by plaintiff or defendant, or until some legal proceeding is taken to impeach the truth of the supposed fact, assuming that the contract itself is not contrary to law.   In other words, supposing the contract to be lawful and binding, the party or parties (it may be one or it may be all) pledging or justly assuming the fact in question will be estopped from taking any position to the detriment of other parties inconsistent with the special fact except for the purpose of reforming the language of a written contract and making it conform to the real terms of the agreement."   Bigelow on Estoppel (5 Ed.), pp. 459, 460; 11 Am. and Eng. Ency. Law (2 Ed.), 400; 1 Greenl. Ev. (15 Ed.), sec. 22; 2 Ency. Pl. and Pr., 459; Maclennan on Interp., pp. 148-154.

*George H. Williams* for respondents.

(1) "When it appears that there are conflicting claims to a sum of money owing by the debtor (to two or more persons), each with a color of, or apparent right, and the debtor, being disinterested as to the rights of either, would hazard a suit by the other if he paid to either, he may maintain a bill of interpleader." Roselle v. Bank, 119 Mo. 84; Hayden's Executors v. Marmaduke, 19 Mo. 403; Keener v. Grand Lodge, 38 Mo. App. 543; Sullivan v. Knights, etc., 73 Mo. App. 43; State ex rel. v. Kumpff, 62 Mo. App. 335; 3 Pomeroy Eq. Jur., sec. 1320; Davidson v. Hough, 165 Mo. 561; Woodmen v. Wood, 100 Mo. App. 655.   (2)   It was not

necessary for the Trust Company to decide at its peril either close questions of fact or nice questions of law, but it was sufficient if there was a reasonable doubt as to which claimant the debt belonged. Briant v. Reed, 1 McCart. (N. J. Eq.) 271; Crane v. McDonald, 118 N. Y. 655; Woodmen v. Wood, 100 Mo. App. 655. (3) An estoppel against A can arise only where B, in whose favor it is sought to raise it, has acted to his prejudice upon some statement or representation of A's. Acton v. Dooley, 74 Mo. 67; Blodgett v. Perry, 97 Mo. 263. (4) The facts are all set forth in the complaint; are admitted practically in their entirety; are fully sustained by the proof; are found by the court, and contain all essentials of a strict interpleader.

VALLIANT, J.—This is an appeal from a decree sustaining a bill of interpleader. The plaintiffs as stockholders of the Kansas & Texas Coal Company, brought suit in behalf of themselves and all other such stockholders against the St. Louis Union Trust Company to compel payment to them of what they claim is a balance of a trust fund applicable to their stock. The defendant, The St. Louis Union Trust Company, filed a cross-bill, in the nature of a bill of interpleader, admitting the possession of the fund, but averring that other parties claimed it, adverse to the plaintiffs' claim, making those other parties defendants to the cross-bill, praying to be allowed to pay the fund into court and be then discharged with its costs, and that the plaintiffs and the other parties named be required to interplead for the fund. Upon the filing of the cross-bill the parties therein named as claimants of the fund, among which was the National Bank of Commerce, were brought in and contested the right to an interpleader. The cause was heard on the pleadings and proof, and a decree in conformity with the prayer of the cross-bill requiring the parties to interplead for

the fund in dispute was rendered, from which decree the National Bank of Commerce has appealed.

There is little, if any, dispute as to the facts, which are as follows:

The Kansas & Texas Coal Company, a Missouri corporation (hereinafter called the Kansas Company), owning mines and mining property, having a paid-up capital of $2,000,000 divided into 20,000 shares of stock of $100 each, par value, in 1891 increased its capital stock by adding $500,000 in 5,000 shares of $100 each. The purpose of issuing this increased stock was to obtain means to purchase other mining property, which was done. Of this 5,000 shares of increased stock 4,366 shares were purchased by the then shareholders, leaving unsold 634 shares, for which a certificate was issued to Mr. Heath as treasurer of the corporation and by him endorsed in blank and deposited in the safe deposit box of the corporation in the St. Louis Union Trust Co. where it remained until 1900, when it was cancelled and two certificates issued in its stead, one for 600 shares in the name of Mr. Hobart, who was the president of the corporation and who used it as collateral for a loan which he obtained for the corporation of $20,000, which loan was afterwards paid, the collateral redeemed and the certificate for the 600 shares was returned to the president, Mr. Hobart, who endorsed it to Mr. Heath, as treasurer, and it was redeposited in the company's safe deposit box. In the meantime a certificate for the 34 shares had been issued in the name of Mr. Heath as treasurer, and also deposited in the company's safe deposit box. The 5,000 shares of increased stock were carried on the books of the corporation as an asset until the sales of the 4,366 shares of the same to the then stockholders as above mentioned, after which only the 634 shares were carried on the books as the property of the corporation and so stood in 1902, when this corporation sold out to the Central Coal & Coke Company, as will be presently mentioned.

In 1902 the Central Coal & Coke Company. (hereinafter called the Central Company), proposed to the Kansas Company and its stockholders, to purchase all of the capital stock of that company, 25,000 shares, at the price of $55 a share, amounting to $1,375,000, which proposition was accepted. But when the Central Company undertook to gather the money to make the purchase it experienced a difficulty which made it necessary to alter its proposal and thereupon it proposed, instead of purchasing the stock, "to purchase all of the real and personal property of the Kansas & Texas Coal Company, including its assets of every kind, and to pay therefor one million three hundred and seventy-five thousand dollars." The only difference in effect in the two proposals being, the first was for the purchase of all the capital stock, the second for the purchase of all the assets of the corporation, the price offered in both being the same. The proposition carried also the obligation of the Central Company to assume all the liabilities of the Kansas Company. This proposition was also accepted by the Kansas Company and all its shareholders.

This proposal of the Central Company to purchase the assets of the Kansas Company was in writing and it specified that the Central Company would pay the Kansas Company $1,375,000 in cash and assume all its liabilities "so that there shall remain for distribution among your stockholders said cash payment of one million three hundred and seventy-five thousand dollars." And it was also therein specified that the Central Company would "give such bonds of indemnity as may be deemed necessary to enable you to distribute to the stockholders of the Kansas & Texas Coal Company the entire cash payment above contemplated."

The St. Louis Union Trust Company was selected as the medium for carrying the contract into effect. The Central Company deposited with the St. Louis Union Trust Company $1,375,000, of which $1,201,650 was in

cash, and the balance in shares of stock of the Central Company, which some of the shareholders of the Kansas Company had agreed to take in lieu of cash.

A written contract was entered into between the Trust Company and the stockholders of the Kansas Company, reciting in its preamble the contemplated purchase of the assets of the Kansas Company by the Central Company for the price named, $1,375,000, to carry which into effect it was agreed that the stockholders would deposit their stock with the Trust Company which was made their agent and authorized to vote the same and authorized to assent to any contract the officers and directors of the Kansas Company might make with the Central Company to carry the purchase into effect, provided it should yield the stockholders at least $55 a share for their stock, and secure the payment of the liabilities of the Kansas Company; it was also agreed that the entire net proceeds of the sale received from the Central Company for the assets of the Kansas Company should be paid and distributed by the Trust Company to these stockholders according to their respective interests.

Under that contract all the stockholders of the Kansas Company deposited their respective stock holdings with the Trust Company, and each received from the Trust Company a receipt or certificate of deposit for the stock he deposited. In this receipt or certificate the contract last above mentioned was referred to and it was therein recited that the original contract between the stockholders and the Trust Company above mentioned was lodged with the Trust Company, that the holder of the receipt was a party to that contract, and the receipt or certificate concluded as follows: "The legal holder of this certificate is entitled to receive in cash the sum of fifty-five dollars per share for each and every share of stock so deposited, out of the proceeds of the sale of the assets, real estate and

197 Sup.—19

property of said Kansas & Texas Coal Company, as and when the same is payable under and pursuant to the terms of said agreement. This certificate is transferable only on the books of the undersigned, when properly endorsed and surrendered for that purpose.''

Stock certificates for the whole 25,000 shares of stock were thus deposited in the Trust Company, including the two certificates for the 634 shares in question which were deposited by Mr. Heath as treasurer of the Kansas Company, he stating to the Trust Company at the time that they belonged to the Kansas Company, and he received a receipt or certificate as above described in his name as treasurer. After receiving this receipt or certificate Mr. Heath by his written endorsement assigned the same to Mr. Hobart individually, and he assigned it to the National Bank of Commerce, to whom also the Central Company assigned the 634 shares of stock, and the Bank has demanded of the Trust Company payment for the stock at the sum of $55 a share, which demand the Trust Company has refused.

Pursuant to the terms of its contract the Trust Company has paid to all of the shareholders the sum of $55 a share for their stock so as above mentioned deposited, except the bank, the holder of the receipt for the 634 shares in question, and the Trust Company still has in its keeping the sum of $34,870, which is sufficient to pay $55 a share for those 634 shares, if it is to be so paid, or to pay an addition of $1.43 a share for the other 24,366 shares if it is to be paid on them. The whole controversy in this case is involved in the question, who is or are entitled to that balance of $34,870? The plaintiffs who are some of the stockholders have sued the Trust Company claiming that the fund belongs to the stockholders, the National Bank of Commerce claims not only that the fund belongs to it, but also that its right to the fund is so unquestionable that the Trust Company has no right to relieve it-

self of the responsibility involved by paying the money
into court and requiring the Bank to interplead for it.

I. To entitle one to maintain a bill of interpleader
in equity he must be a mere disinterested stakeholder
or trustee; impartial in so far as his conduct may in-
fluence the judgment to be ultimately rendered between
the conflicting claimants, he must act in good faith and
he must have reasonable cause for a real doubt as to
which of the claimants is entitled to the fund.

It is insisted in the brief for the Bank that the
Trust Company has not acted in good faith, that it has
instigated the stockholders to make this claim. The ev-
idence in the case indicates that in the transactions un-
der review the fact that there were 634 shares of stock
unissued and belonging to the corporation was over-
looked, at least that no express provision was made in
reference to it. There was evidence to the effect that
at a meeting of the directors of the Kansas Company
while the subject of the sale was under discussion, Mr.
Leighton, the vice-president, asked what disposition
was to be made of the 634 shares of unissued stock, and
Mr. Hobart, the president, replied that he had ar-
ranged to buy them from the Central Company. That
is the only mention of those shares that was made dur-
ing the negotiations and that is all that was said, noth-
ing was done. The certificates for the 634 shares were
deposited with the St. Louis Union Trust Company by
Mr. Heath as treasurer by order of Mr. Leighton, vice-
president, in the absence of the president. The
$1,375,000 was deposited by the Central Company with
the Trust Company on April 16, 1902. On that day
some of the stockholders, among them Mr. Leighton,
Mr. Davis and Mr. West, directors of the Kansas Com-
pany, discussed among themselves the question as to
the status of those shares, and the result was Mr.
Leighton notified Mr. Orr, who was the trust officer of
the Trust Company and had charge of the matter, not
to pay anything on those shares. Mr. Orr, upon being

so notified, sent for Mr. Sherwood, the attorney for the Kansas Company, and Mr. Perry, attorney for the Central Company, and discussed the matter with them. Neither of those gentlemen had heard of the matter before. Mr. Perry said he had not known that there was any unissued stock, but expressed no opinion on the legal question; Mr. Sherwood expressed the opinion that the holder of the receipt for those shares was not entitled to payment. On that day or the next, Mr. Hobart presented the receipt and demanded payment and it was refused. After the conference between Mr. Orr and the two attorneys, Mr. Orr in conversation with some of the stockholders told them of the question that had arisen, and of Mr. Sherwood's opinion, Mr. Sherwood also spoke of it with such of the stockholders as he chanced to meet, and in that way the matter came to be discussed by the stockholders, and soon a demand was made in behalf of some of them on the Trust Company for the payment of the additional $1.43 a share, which the Trust Company refused and this suit followed.

There is nothing in the facts of this case to indicate bad faith on the part of the Trust Company or collusion with the stockholders to bring this suit. When the question was once raised, if it was deemed by the Trust Company a serious one, if the facts were sufficient to cause the Trust Company to seriously question whether it was in duty-bound to pay the money to the holder of the receipt for the 634 shares of stock or to divide it pro rata with the other shareholders, there was nothing wrong in informing the stockholders that such a question had arisen. The Trust Company was the trustee of this money, holding it for whomsoever in law was entitled to it, and if the stockholders were in law entitled to it, good faith demanded of the trustee that they should have it, even though they had known nothing of it before and had erroneously supposed that they had already received all that they were entitled

to. Indeed, if the trustee after its attention was called to the matter had withheld from the stockholders this information it would have been an act of bad faith to them; they were entitled to know it, and it was the duty of the trustee, who was in a fiduciary relation to them as well as to Mr. Hobart or the Bank, to give them the information.

It is said in appellant's brief in connection with the suggestion that the suit of the stockholders was procured by collusion, that the plaintiffs in that suit consented that this decree of interpleader should be entered. The only legitimate inference that can be drawn from that fact is favorable to appellant, that is, that the plaintiffs concede to the Bank that its claim is of such a character as fairly deserves the consideration of the court; also that they concede without detriment to their own claim, that in view of the Bank's claim the Trust Company is entitled to the judgment of the court before paying the money to either. The Bank has no cause to complain of that.

II. The receipt or certificate issued by the Trust Company to Mr. Heath as treasurer for this stock does not estop the Trust Company from questioning the holder's title to the same. The receipt is not commercial paper, it is not a negotiable instrument in the sense of the law merchant. It indicates on its face that the title to the stock is in the Kansas Company—not in Mr. Heath individually—therefore the mere assignment of it by Mr. Heath did not preclude the Trust Company from questioning the title of the assignee. Besides the receipt on its face says that it was issued to "W. P. Heath, Treasurer, Kansas & Texas Coal Company . . . under and pursuant to the terms of a certain trust agreement (original of which is lodged with the St. Louis Trust Company)," etc. Therefore, an assignee taking the receipt is chargeable with notice of the contents of that trust agreement, and if, as the plaintiffs, the stockholders, claim, that agreement

means that the whole sum of $1,375,000 is to be divided *pro rata* among the bona-fide holders of the stock that had been actually issued, to the exclusion of the holder of the certificates for the 634 shares which were never issued, then the assignee is bound by the terms of that agreement and has no right to the fund in dispute. In issuing that receipt the Trust Company assumed no obligation except to carry out its obligation theretofore made in that trust agreement, and the only effect of the receipt was to show that the holder thereof was entitled to as much, if any, of the trust fund as the owner of the particular 634 shares of stock mentioned in the receipt was entitled to under the terms of that trust agreement, nothing more.

III.   It is contended that the Trust Company could have obtained an absolute discharge of its obligation by paying the fund over to the Bank, regardless of the equities, for the simple reason that the Bank was the legal holder of the receipt. That is to say, although the stockholders may be entitled to this trust fund in the hands of their trustee, yet if the Bank is the legal holder of the receipt, the trustee would be discharged of its duty if it paid the money to the Bank. These stockholders have not selected this Bank for their trustee in this matter; they have chosen the Trust Company and have caused the trust fund to be put into its hands, and are now demanding that fund of their trustee, and there are but two ways in which the trustee can meet that demand, one is to pay them the money demanded, the other is to show that they are not entitled to it.

The receipt contains no promise to pay; it is only a certification by the trustee, as such, that "the legal holder of this certificate is entitled to receive in cash the sum of fifty-five dollars per share for each and every share of stock so deposited, out of the proceeds of the sale of the assets, real estate and property of said Kansas & Texas Coal Company as and when the same is

payable and pursuant to the terms of said agreement.''
Under the very terms of the receipt, of which it claims
to be the legal holder, if the Bank is entitled to the
fund it is so entitled under and pursuant to the terms
of that trust agreement, not otherwise.

IV.  The main insistence of appellant is that its
title to the fund in question is so absolutely clear that
it leaves no room for a reasonable doubt, and there-
fore the Bank ought not to be put to the expense of
interpleading.

It will be difficult to discuss this proposition with-
out using language that might be interpreted as ex-
pressing our opinion on the Bank's title, which we do
not intend to do at this time, because that title is not
before us now for judgment, and we would not say any-
thing that might prejudice the Bank's case when it
comes to trial.  What is hereinafter said under this
head therefore is only intended to show that in our
opinion the question of title is a serious one and the
Trust Company is entitled to have it settled in a court
of equity by interpleader.

After the money had been paid into the Trust Com-
pany, a meeting of the board of directors of the Kansas
Company was held, at which a resolution was adopted
by which the Trust Company was directed to pay the
shareholders $55 a share, in which resolution was this
clause: ''which payment, so made by said Trust Com-
pany to holders of said stock, shall be in final liquida-
tion of the assets of said Kansas & Texas Coal Com-
pany, and shall be accepted by said holders as such.
After making such distribution said trust company
shall be authorized to transfer the certificates repre-
senting the capital stock of this company to such per-
son, or persons, as the Central Coal & Coke Company
may in writing direct.''

And upon payment by the Trust Company to the
shareholder of the $55 per share, each shareholder gave
the Trust Company a receipt in full and authorized it

to transfer the stock to such person or persons as the Central Company might direct. Appellant thinks that those documents preclude the stockholders from demanding anything more after they have received the sum specified; but can a resolution of the directors limit the stockholders in their demands, or if under the trust agreement the stockholders are entitled to more than they have received, does the fact that they have given a receipt in full preclude them from demanding their due?

It is said that only two-fifths of the stockholders are making this demand, while the balance recognize the Bank's claim. Every stockholder is free to act for himself; therefore, because even a majority are willing to concede the Bank's claim, the minority are not bound to do so. Besides, before we can give due weight to the opinion of the majority on such a question it would be necessary to know what relation the complacent stockholders bear to the Bank. As a general rule men act in such matters as their interests prompt.

Up to the date of the sale of its assets of the Kansas Company to the Central Company these 634 shares of stock had never been sold, never issued; they remained the property of the Kansas Company and the certificates were held in its treasury; the title to them therefore passed with the other assets of the Kansas Company to the Central Company, and appellant says, the Central Company having sold the stock to Mr. Hobart and he to the Bank, that is the end of the controversy. And so it would be if the controversy was over the ownership of the 634 shares of stock, but that is not the controversy; the stockholders who have brought this suit against the Trust Company are not claiming to own that stock, but are claiming what they think is their share of the money which the Central Company paid the Kansas Company for that stock. Their theory is that the $1,375,000 paid by the Central Company was the purchase money of all the assets of the Kansas Com-

pany, and that the stockholders, that is, those who own the stock that had been issued before the sale, are entitled to all that money, to be divided among them *pro rata* according to their stockholdings as expressly stated in the trust agreement, that the $34,870 now in the hands of the Trust Company is the price paid to the Kansas Company by the Central Company for these 634 shares of treasury stock, just as the balance of the $1,375,000 was the price paid for the mines and other property, and that that which the Central Company is entitled to is the property which it purchased, it is not entitled to the money it paid for the same, that the Central Company if it pleases may sell to Mr. Hobart or the Bank the mines or the treasury stock or any other of the assets so purchased, but the ownership of the property so acquired would not authorize the assignee to have the property and the price paid for it also.

We cannot say that that theory is so void of reason that the Trust Company has not the right to have the courts to settle the controversy.

Appellant says that the Bank by the assignment from Mr. Hobart is a stockholder to the extent of 634 shares and entitled as such to share with the other stockholders the proceeds of the sale. But since the Bank in this instance must stand in the shoes of Mr. Hobart, and he in the shoes of the Central Company, the following questions arise: Can an assignee by his assignment acquire a greater right than the assignor had? could the Central Company who bought this asset and paid $34,870 for it retain the asset and recover back the purchase money? what right has the Central Company to the stock if it is entitled to take back the money it paid for it? and if it has no such right can it impart such right to its assignee? Again, if there had been no intervening trustee employed, if the Central Company had paid the $1,375,000 directly into the treasury of the Kansas Company and the Kansas Company had thereupon, as was the purpose of the sale,

ceased business and wound up its affairs to whom would the money in the treasury belong? These questions arise when we face the proposition of the appellant that its title is too clear to admit of a doubt, and without answering them or intending to intimate any opinion on them we deem it proper to say that they are questions for the trial court to consider.

For some reason the Central Company seems to have desired to acquire all the stock of the Kansas Company and therefore in the receipt taken by the Trust Company from each stockholder on payment to him of the $55 a share is a clause authorizing the Trust Company to transfer the stock to whomsoever the Central Company should designate, but that was not intended to authorize the Central Company or the person designated by it to withdraw from the Trust Company any of the purchase money paid by the Central Company for the assets of the Kansas Company.

V. The remaining question in the case is, can the stakeholders or trustee maintain a bill of interpleader when the facts are practically undisputed and the only question is one of law? Appellant's contention is that when the facts are undisputed it is the stakeholder's duty to consult his counsel learned in the law and decide the question of law at his peril. That doctrine in its unlimited scope would impose a very onerous burden on a stakeholder and give a very harsh force to the doctrine that every one is presumed to know the law. Courts of equity do not administer justice with so harsh a rule. A bill of interpleader is an invention of equity jurisprudence, and is designed to relieve a party who holds in trust a fund to which there are several claimants and who in good faith is in doubt, and has reasonable grounds to doubt, as to whom it should be paid. Appellant cites Sullivan v. Knights of Father Mathew, 73 Mo. App. 43, and Funk v. Avery, 84 Mo. App. 490, as holding that in order to sustain a bill of in-

terpleader the doubt as to the merits of the rival claims must be founded on a question of fact as distinguished from a question of law. The language quoted from the Sullivan case is that to sustain such a bill it "should show that there is some doubt in point of fact to which of the rival claimants the admitted debt or duty belongs," and this is repeated in the other case. But after reading those opinions we think the court intended only to say that in point of fact the bill should show that there was doubt as to which of the rival claimants was entitled to the fund, not that the doubt should be as to the facts.

In Woodmen v. Wood, 100 Mo. App. l. c. 658, the precise question was discussed and decided; the court, per ELLISON, J., said:

"It has been sometimes suggested that the doubt as to which of the claimants is entitled to the thing claimed by them must be a doubt as to the facts upon which their claims are founded and that a doubt as to the law would not justify an interpleader. A remark in Supervisors v. Alford, 65 Miss. 63, seems to justify the suggestion. But when it is considered that the object of a bill of interpleader is to save the debtor or other party in possession of the thing claimed, from the hazard of paying to the wrong party, as well as the harassment of suits, it seems to be clear that a doubt of the law as to the opposing claims should justify a bill for an interplea as well as a doubt of fact. And so it has been decided. [Crane v. McDonald, 118 N. Y. 648.]"

In Hayden's Exrs. v. Marmaduke, 19 Mo. 403, this court, per GAMBLE, J., said: "Any trustee placed in circumstances in which he may have reasonable doubt as to the proper disposition of the funds in his hands, has a right, for his own safety, to apply to a court of equity for directions, making the persons interested parties to the proceeding."

In 5 Pomeroy Eq. Jur. (3 Ed.), sec. 40, p. 68, after stating that the rival claims must have some reasonable foundation so that the trustee cannot without hazard determine to which of the claimants he should pay the fund, the law-writer adds: "The plaintiff's risk may depend up a doubtful and disputed question of law, instead of a question of fact." The text-writer in that connection refers to Crane v. McDonald, 118 N. Y. 648, which fully sustains the text.

We hold that a bill of interpleader may be maintained not only when the conflicting claims depend on a question of fact but also when they depend on a question of law, when, as said by the New York Court in the case above cited, there is "sufficient doubt and hazard to justify the protection which is afforded by the beneficent action of interpleader."

The trial court took the right view of this case. The judgment is affirmed.

All concur, except *Graves, J.*, not sitting.